UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED

01 JUN -5 AM 11: 28



ROGER FREELAND, on his own behalf,
ROSELYN FREELAND, on her own behalf,
and as mother and next friend of REX FREELAND
a minor with severe brain damage,

                Plaintiffs,

vs.                                            No.   99-1500 MV/WWD ACE

THE UNITED STATES OF AMERICA,

                Defendant.

## PLAINTIFFS' PROPOSED CONTESTED FINDINGS OF FACT

1.     As of May 10, 1999, Rex Freeland had been living with his parents, Roger and Roselyn Freeland and with his brother Roderic Freeland and with his sisters Roshanda Freeland, Rodricana Freeland, Roxanda Freeland, Yolanda Freeland, and Rolanda Freeland.

2.     From the beginning of the surgery until Dr. Samuel Horton assumed Rex's care after the endotracheal tube was removed in the Intensive Care Unit (ICU), Dr. Jerome Holbrook was continuously in immediate attendance upon and in the physical presence of Rex Freeland at all times.

3.     Dr. Holbrook was primarily responsible for the care and treatment of Rex Freeland at all times until Dr. Horton assumed his care, sometime after the extubation.



4. Under New Mexico law, a CRNA may function only under the direction of and in collaboration with a licensed physician, osteopathic physician, dentist, or podiatrist.

5. From the end of the surgery until after the extubation, Dentist Jerome Holbrook was the only physician, osteopathic physician, dentist or podiatrist present.

6. According to the hospital record, Rex Freeland was transported from the operating room at 3:40 p.m.

7. Rex was transferred from the operating room to the intensive care unit by Dr. Holbrook, by Nurse Steele, and by Elizabeth Schunk, the operating room nurse.

8. The ICU is approximately fifty yards from the operating room.

9. No measurements or record of Rex's vital signs or of his oxygen saturation were made between the time he left the operating room and the time he arrived in the ICU.

10. By the time Rex arrived at the ICU, his skin was cyanotic, a bluish color indicating that his blood was not being oxygenated.

11. Rex Freeland's heart rate, respiratory rate, and oxygen saturation should have been continuously monitored at all times from the conclusion of surgery until he arrived in the ICU.

12. During the transport from the OR to the ICU, as soon as Rex Freeland showed signs of hypoventilation, of bradycardia, of cyanosis, or of decreasing oxygen saturation, appropriate intervention should have been instituted, including ventilatory assistance with an ambu bag, adjustment of the endotracheal tube, muscle paralysis, sedation, and the administration of cardiac stimulants.

13. The transport of Rex Freeland without proper monitoring violated hospital policy 200.1, Standard II: "A patient transported to the Post-Anesthesia Care Unit... shall be continuously evaluated and monitored during transport. Support and treatment appropriate to the patient's condition shall be provided during transport."

14. The failure to monitor Rex Freeland's heart rate, respiratory rate, and oxygen saturation during the transport from the operating room to the ICU constitutes a breach of the standard of care for oral surgeons and for certified registered nurse anesthetists.

15. Dr. Holbrook had the right and responsibility to monitor Rex Freeland and to be sure that he was breathing during the transport from the operating room to the ICU. Additionally, because this was his patient, and because he was the surgeon and physician in charge, Dr. Holbrook had the right and responsibility to require that Rex Freeland be monitored and ventilated as needed during this time.

16. According to the clock on the monitoring equipment in the Intensive Care Unit, Rex arrived in the ICU at 3:57 p.m.

17. When Nurse Winkler first measured Rex's vital signs in the ICU at approximately 3:58 p.m., she found that his oxygen saturation had dropped to 65%, that his heart rate was 35 beats per minute, and that he was not breathing.

18. Dr. Holbrook has admitted in his deposition that he was responsible for Rex's care throughout his hospital stay.

19. Within a few minutes of arrival, Dr. Holbrook and Nurse Steele decided to remove Rex's endotracheal tube.

20. The endotracheal tube was the means or conduit through which air and oxygen could and should have been delivered to Rex's lungs.

21. The endotracheal tube should not have been removed. The removal of the endotracheal tube by Dr. Holbrook and Nurse Steele violates hospital policy 406, "Extubation of the Difficult Airway."

22. Dr. Holbrook had the right and responsibility to maintain the endotracheal tube, and to refuse to remove the endotracheal tube.

23. Dr. Holbrook had the ultimate authority to decide whether or not the endotracheal tube should be removed.

24. Rex Freeland's endotracheal tube was removed under the direct and immediate supervision of Dr. Holbrook and with his approval.

25. The removal of the endotracheal tube was a negligent and reckless act.

26. Removal of the endotracheal tube under these circumstances constitutes a breach of the standard of care for oral surgeons and for certified registered nurse anesthetists.

27. Immediately after the endotracheal tube was removed, Rex went into cardiorespiratory arrest, leading to a "code blue" with initiation of cardiopulmonary resuscitation (CPR).

28. By 4:04 p.m. according to the clock on the monitor in the ICU, the endotracheal tube had been replaced, oxygen was being pumped into his lungs, he had received atropine and epinephrine, and his heart was beating effectively.

29. An arterial blood gas (ABG) sample taken sometime after 4:04 p.m. (monitor time) showed that Rex's oxygen saturation was 98%, his pH was 6.87, and his

4

pCO2 was 112. The normal pH is 7.42, and the normal pCO2 is 30.

30.    A pH of 6.87 and a pCO2 of 112 indicates a severe respiratory acidosis which is incompatible with life. The high pCO2 indicates that Rex had not been breathing or ventilating (or had been hypoventilating) for at least seven to twenty minutes prior to the time that the ABGs were drawn.

31.    Rex Freeland has not woken up.

32.    Rex Freeland never will wake up.

33.    Rex Freeland suffocated while under the care and supervision of Dr. Jerome Holbrook between 3:30 p.m. and 4:04 p.m.

34.    As the percentage of oxygen in his blood decreased during this time (as a result of hypoventilation) Rex's heart rate also gradually decreased, causing increasingly less oxygenated blood to reach his brain.

35.    Ultimately, Rex's Freeland's brain was receiving no oxygenated blood at all, and the cellular environment became increasingly acidotic, until the ventilation and circulation were finally restored by approximately 4:04 p.m. (monitor time).

36.    During the entirety of the time from the initiation of surgery through 4:04 p.m. (and beyond) Rex Freeland was entirely under the influence of anesthetic medications, making him completely and absolutely dependant on Dr. Holbrook and Nurse Steele for his health and safety.

37.    Dr. Holbrook, as the treating physician who admitted Rex to the hospital, who performed the surgery, and who transported Rex to the intensive care unit, is primarily responsible for any and all injuries and damages which occurred.

38.  Dr. Holbrook has admitted in his deposition that he was responsible for Rex's care throughout his hospital stay.

39.  Dr. Holbrook was negligent in his care and treatment of Rex Freeland.

40.  Nurse Steele was negligent in his care and treatment of Rex Freeland.

41.  As a direct and proximate result of the negligence of Dr. Jerome Holbrook and Nurse Michael Steele, Rex Freeland was suffocated, causing hypoxic ischemic encephalopathy.

42.  Rex Freeland will require licensed nursing care twenty-four hours per day for the rest of his life.

43.  The cost of obtaining appropriate care for Rex Freeland in Albuquerque, New Mexico is at least $254,192.00 per year. In Phoenix, Arizona the cost of obtaining such care is $342,597.00 per year.

44.  Over Rex Freeland's life expectancy, the cost of his care, reduced to present value, will total at least $9,736,717.00 if Rex lives in Albuquerque. If Rex lives in Phoenix, the cost of his care, reduced to present value will be at least $14,243,927.00.

45.  The cost of purchasing a home in which Rex could be cared for appropriately by his family and by licensed care givers, is approximately $180,000.00, including the necessary modifications.

46.  The value of Rex Freeland's lost earning capacity is $929,970.00.

47.  The value of the household services which have been lost is $258,062.00.

6

48. The value of the conscious pain and suffering experienced by Rex Freeland while he was being suffocated is $1,000,000.00.

49. The value of the loss of enjoyment of life suffered by Rex Freeland is $3,000,000.00.

50. The cost of providing medical and medical related care to Rex Freeland from the time of injury until the time of trial has been greater than $387,249.94.

51. The value of the loss of consortium suffered by Roselyn Freeland is $1,000,000.00.

52. The value of the loss of consortium suffered by Roger Freeland is $1,000,000.00.

53. If Rex Freeland receives appropriate medical, nursing, and related care at home, he should have a life expectancy to age seventy-three.

        MOFFAT & DICHARRY
        Attorneys for Plaintiffs
        1005 Luna Circle NW
        Albuquerque, NM 87102
        (505) 242-2774

        _____
        STEPHEN MOFFAT

We hereby certify that a true and accurate copy of the foregoing pleading was mailed to opposing counsel this 4th day of June, 2001

_____
STEPHEN MOFFAT