IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ROGER FREELAND, on his own behalf,
ROSELYN FREELAND, on her own behalf,
and as mother and next friend of REX
FREELAND, a minor with severe brain damage,

        Plaintiffs,

v.                                                                                             No. CIV 99-1500 MV/WWD

THE UNITED STATES OF AMERICA,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Plaintiffs' Motion to Preclude Testimony of David Strauss, Ph.D., filed May 7, 2001 **[Doc. No. 46]**. The Court, having considered the motion, response, reply, and surreply, relevant law, and being otherwise fully informed, finds that the motion is well taken and will be **GRANTED**, as explained below.

**BACKGROUND**

The factual and procedural history of this action is set forth in the Court's Memorandum Opinion and Order granting Plaintiffs' Motion for Summary Judgment (*See* Doc. No. 42). Therefore, the Court will simply provide a brief summary of the background here. This is a medical malpractice action brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.* In their Complaint for Medical Malpractice, Plaintiffs allege that Rex Freeland underwent oral surgery on May 10, 1999, that Dr. Holbrook performed the surgery with the assistance of Certified Registered Nurse Anesthetist (CRNA) Michale Steele, that both

1

Holbrook and Steele are employees of the Defendant, that Holbrook and Steele were negligent in their care of Rex, and that this negligence resulted in Rex's being in a permanent vegetative state. Plaintiffs allege that Rex will remain in a vegetative state and will require 24-hour skilled nursing care for the remainder of his life.

Plaintiffs intend to call three physicians as expert witness to testify about Rex's medical condition and future medical needs. *See* Mot. to Preclude at Ex. 8, 9, 10. These witnesses will testify that Rex's life expectancy is not shortened, i.e., that he has a normal, or near normal, life expectancy. *See id.* Defendant intends to call Dr. David Strauss, Ph.D., who will testify that Rex's life expectancy is only 8.5 years. *See* Mot. to Preclude at Ex. 3. Dr. Strauss, who is not a physician, bases his conclusion on a computer analysis of a database containing 1,021 patients who are also in a permanent vegetative state.

Plaintiffs have filed a motion *in limine*, seeking an Order from the Court excluding Dr. Strauss's testimony. Plaintiffs contend that the proffered expert testimony is inadmissible under Fed. R. Civ. P. 26 and Fed. R. Evid. 702.[1] Defendant filed a timely response and Plaintiffs timely replied. At a pretrial conference held in this matter on June 7, 2001, the Court granted Defense counsel's request that she be permitted to file a surreply. Defendant has filed a surreply and the matter is now ripe for decision.

## STANDARD OF REVIEW

In order to determine whether proffered expert testimony is admissible, a District Court looks to the Federal Rules of Evidence, pursuant to which "scientific, technical, or other specialized knowledge" may be admitted if the proffered testimony "will assist the trier of fact to

---

[1]Because the Court finds that the proffered expert testimony is inadmissible under Fed. R. Evid. 702, the Court declines to address Plaintiffs' argument that the testimony is inadmissible under Fed. R. Civ. P. 26.

understand the evidence or to determine a fact in issue," and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

When a District Court is faced with a proffer of expert testimony under Rule 702, the Court "must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). In other words, the District Court must act as a "gatekeeper" by evaluating whether the proffered testimony is both sufficiently relevant and sufficiently reliable. *See id.*

In assessing the reliability of proffered testimony, the court should consider: (1) whether the theory or technique to be testified about "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," and (3) "the known or potential rate of error." *Id.* at 593-94. Finally, whether the theory or technique has been "generally accepted" in the field in which it belongs "can yet have a bearing on the inquiry." *Id.* at 594. This test applies to proffered expert testimony that is of a technical, as well as that which is of a scientific nature. *Kumho Tire Company, LTD., et al. v. Carmichael*, 526 U.S. 137, 141 (1999).

The test of reliability is "flexible"; the list of factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142. Therefore, the court may, but is not

3

required to, address the factors listed in *Daubert*. Regardless of the method the court employs in determining whether to admit scientific or technical evidence, "the court must, on the record, make *some* kind of reliability determination." *United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000).[2]   The trial court's determination regarding the admissibility of expert testimony is reviewed for an abuse of discretion. *Velarde*, 214 F.3d at 1208.

## ANALYSIS

Plaintiffs argue that Dr. Strauss's testimony fails the reliability prong of *Daubert* test because: Dr. Strauss testified in his deposition that he is the only person in the world doing the kind of statistical analysis which he purports to be doing and no one can evaluate his results without access to his software, which is proprietary; his opinions have not been evaluated for any potential rate of error; while his articles on life expectancy in general have been subject to peer review, his predictions of a particular individual's life expectancy have not; and his opinion has been generated solely for the purpose of litigation.  *See* Mot. to Preclude at 6-9.

Plaintiffs concede that Rex's life expectancy is relevant to the issue of damages, but maintain that Dr. Strauss's testimony is not relevant to this particular case because Rex's injury is distinct from the injuries suffered by the patients included in Dr. Strauss's database and because the quality and quantity of care that Rex will receive is different than that received by the patients included in Dr. Strauss's database.  Specifically, Plaintiffs argue that Rex's injury is limited to

---

[2]The Tenth Circuit has recently emphasized the importance of the District Court's gatekeeping role.  *See Goebel v. Denver & Rio Grande Western R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000).  In *Goebel*, the Tenth Circuit emphasized that the Court "must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Id.* at 1088.  The Court is not required to hold a hearing, *see id.* at 1087, but rather may "satisfy its gatekeeper role when asked to rule on a motion in limine, on an objection during trial, or on a post-trial motion," *id.*  What is most important is that the District Court have "sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand,'" *id.* (quoting *Daubert*, 509 U.S. at 597), and that it make specific findings on the record.  *id.*

hypoxic damage to his brain and that he has no other end organ damage, whereas most of the patients in Dr. Strauss's database have suffered other associated injuries and illnesses. *See* Mot. to Preclude at 10-11; Ex. 4 at 29-33; Ex. 9. Moreover, Plaintiffs argue that Rex will receive 24-hour skilled home care, whereas most of the patients in Dr. Strauss's database have received substandard care in government-operated nursing institutions. *See* Mot. to Preclude at 13-14. Because the presence of end organ failure and the fact of substandard care both decrease the life expectancy of a patient in a vegetative state, Plaintiffs maintain that a conclusion based on Dr. Strauss's database is irrelevant.

Defendants argue in response that "the methods used by Dr. Strauss are entirely standard biostatistical methods, and the work has been peer-reviewed in many leading scientific journals." Resp. to Mot. to Preclude at 8. Moreover, Defendant argues that Plaintiffs' motion should be denied because one of Plaintiffs' own witnesses testified in deposition that Dr. Strauss is qualified to render an opinion, *see* Surreply to Mot. to Preclude at 1-3, and because Plaintiffs' arguments concerning the relevance of Dr. Strauss's database to the precise issue presented here mischaracterize the evidence, *see id.* at 6-7.

Finally, Defendant maintains that the Court should hear Dr. Strauss's testimony before ruling because "it is premature to exclude testimony based on reliability prior to the testimony being tendered at trial." Resp. to Mot. to Preclude at 7. Therefore, Defendant maintains that it "is entitled to have Dr. Strauss present his testimony at trial, and have this Court make its determination as to reliability and relevancy," *id.*, and requests that the Court either hold a hearing on the admissibility of Dr. Strauss's testimony or, in the alternative, permit him to testify at trial. *See* Surreply to Mot. to Preclude at 3-4.

The Court makes the following findings with respect to the reliability of Dr. Strauss's

proffered testimony, based on all of the evidence submitted in connection with Plaintiffs' motion:

    1.    The ability of Dr. Strauss's model to calculate the life expectancy of a particular individual has not been tested.

    2.    Dr. Strauss's studies regarding life expectancy in general have been subjected to peer review and publication.

    3.    The ability of Dr. Strauss's model to calculate the life expectancy of a particular individual has not been subjected to peer review and publication.

    4.    Dr. Strauss has testified that none of his published articles actually predicts the life expectancy of a particular individual. *See* Mot. to Preclude, Ex. 4 at 14-15.

    5.    No evidence has been presented that Dr. Strauss's technique has been generally accepted in the field of neurology as a method for calculating the life expectancy of a particular individual with known brain damage.

The Court makes the following findings with respect to the relevance of Dr. Strauss's proffered testimony, based on all of the evidence submitted in connection with Plaintiffs' motion:

    1.    Rex has suffered from hypoxic damage to his brain and does not suffer from other end organ damage. Rex's injury is not the result of traumatic brain injury.

    2.    The presence of end organ damage in patients in a permanent vegetative state affects life expectancy. Patients whose injuries resulted from traumatic brain injury are likely to have a shorter life expectancy than patients whose injuries did not. *See* Mot. to Preclude, Ex. 4 at 29; Ex. 9 at 9.

    3.    Dr. Strauss's life expectancy analysis does not account for patients like Rex who had global encephalopathy without any other organ damage. *See* Mot. to Preclude, Ex. 4 at 80.

    4.    Dr. Strauss does not know, or no evidence has been presented to demonstrate,

what percentage of the 1,021 patients in the database that he used had suffered from traumatic brain injury. *See* Mot. to Preclude, Ex. 4 at 30-31.[3]

5. Dr. Strauss's study does not identify whether the patients included in the database had associated organ damage. *See id.* at 33.

6. Dr. Strauss did not consider the etiology of Rex's injury in calculating Rex's life expectancy. *See id.*

7. Dr. Straus's database includes patients who died because of neglect or because of criminal activity, or because their life support was withdrawn. *See* Mot. to Preclude, Ex. 4 at 57.

8. Dr. Strauss has testified that he has no information regarding the effect of 24-hour home care on life expectancy and that he cannot tell from his study what difference, if any, 24-hour home care would make. *See id.* at 86, 93.

9. Most of the patients included in Dr. Strauss's database received substandard care. *See* Mot. to Preclude, Ex. 4 at 121-22.[4]

---

[3]Defendant states in its Surreply that "a recent search of California Life Expectancy Project's vegetative state data base [sic] showed that 71 of the 1021 persons had suffered an anoxic injury, as opposed to a traumatic brain injury or other causes" and that a statistical analysis conducted by "the research group" revealed that "mortality in the anoxic group did not differ significantly from the others." Surreply to Mot. to Preclude at 6. However, Defendant failed to submit any evidence to support this contention. The Court's obligation here is to "carefully and meticulously" review "the proffered scientific evidence." *Goebel*, 215 F.3d at 1088 (quoting *United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997)). The Court cannot credit unsupported assertions of counsel.

[4]Defendant asserts in its Surreply that while Plaintiffs' argument focuses on "documented shortcomings in the California community system," this does not matter because many "of the patients in the California vegetative state data base [sic] were in the state facilities, which are widely recognized to provide excellent care." Surreply to Mot. to Preclude at 6. While it is true that Plaintiffs focus on shortcomings in the California community system, Defendant fails to note that in doing so, Plaintiffs quote Dr. Strauss verbatim. Furthermore, Defendant does not offer any evidence to support the contention that many of the patients in Dr. Strauss's database received care from state facilities or the contention that the quality of care in state facilities differs from the quality of care in community facilities.

10.     The quality of care received by a patient in a permanent vegetative state affects the patient's life expectancy. *See id.* at 122; Mot. to Preclude, Ex. 6 at 2.

These findings compel the conclusion that Dr. Strauss's testimony is neither relevant to the question presented in this case nor reliable in its ability to answer that question.  The Court is not finding that Dr. Strauss lacks credentials, that his work is not scientifically valid, or that his database and statistical model are inherently flawed.  The Court does find, however, that because his technique has not been tested or peer reviewed, and because his techique has not been generally accepted, *for the purpose for which it is offered*, it is not reliable.  Moreover, because of the differences between Rex's condition and the conditions of the patients included in the database, Dr. Strauss's testimony is not relevant to the precise issue presented here, which is Rex's life expectancy.[5]

Of course, it is never possible to determine, with pinpoint accuracy, when a person will die.  Moreover, courts typically accept life expectancy calculations based on statistical probabilities in wrongful death actions.  However, it does not necessarily follow that basing life expectancy on a stastical calculation is appropriate in this case, where there is an issue as to whether the plaintiffs are entitled to collect compensatory damages for medical care that will be needed for the remainder of Rex's life.

As explained above, a *Daubert* hearing to determine the admissibility of proffered expert

---

[5]The Court is not persuaded by Defendant's argument that one of Plaintiffs' own expert witnesses testified that Dr. Strauss is qualified to render an opinion.  In fact, immediately after stating that Dr. Strauss is qualified to render an opinion, Plaintiffs' expert witness testified that "when you look at that particular issue of life expectancy, there are . . there are several categories that you can make and arrive at some statistical data on expected survivals, but I think you have to be careful as to how that's interpreted when you're viewing a particular individual patient."  Surreply to Mot. to Preclude, Ex. A at 9.  In any event, a physician's opinion that a statistician "is qualified to render an opinion" does not render the statistician's opinion admissible under the Federal Rules of Evidence.

...

testimony "is not specifically mandated." *Goebel*, 215 F.3d at 1087. Rather, so long as it has sufficient evidence before it to make an informed decision, the Court is permitted to decide the issue by ruling on a motion *in limine*. *See id.* The Court finds that it has sufficient evidence before it to fulfill its "gatekeeper" role and that a hearing on this issue would not aid the Court in its disposition of Plaintiffs' Motion.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Preclude Testimony of David Strauss, Ph.D. **[Doc. No. 46]** is hereby **GRANTED**.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE

Attorney for Plaintiffs
MOFFAT & DICHARRY
Stephen Moffat

Attorney for Defendant
Phyllis A. Dow