## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ROGER FREELAND, on his own behalf,
ROSELYN FREELAND, on her own behalf,
and as mother and next friend of REX
FREELAND, a minor with severe brain damage,

        Plaintiffs,

v.                                    No. CIV 99-1500 MV/WWD

THE UNITED STATES OF AMERICA,

        Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** is before the Court on a bench trial held from June 25 through June 28,

2001.  The Court having considered the pleadings, trial testimony, exhibits, relevant law, and

being otherwise fully informed, finds that Defendant United States of America did breach its duty

of care to Rex Freeland and that Plaintiffs are entitled to recover compensatory damages for their

injuries.

### I.  BACKGROUND

In May of 1999, Rex Freeland was a 15-year-old boy who lived with his mother and

siblings on the Navajo reservation in Becenti Lake, New Mexico, eight miles east of Crown Point.

On May 9, 1999, Rex's mother Roselyn Chia brought Rex to the emergency room in Crown Point

because Rex was complaining of a toothache and had swelling in his neck.  At the emergency

room, Rex was seen by a doctor, given some antibiotics, and told to return the next day to see a

dentist.  On May 10, 1999 Ms. Chia brought Rex back to the emergency room, as instructed.  Rex

was seen by a dentist, who thought that Rex had an abscess and recommended surgery.  The

dentist referred Rex to an oral surgeon, Dr. Jerome Holbrook, at Gallup Indian Medical Center

(GIMC) for surgery.

Dr. Holbrook admitted Rex to GIMC and performed the surgery.  Dr. Holbrook was

physically in attendance at all times material during and after the surgery.  It was agreed that Rex

would need to be placed under general anesthesia for the surgery; the anesthesia was provided

and administered by Michael Steele, a Certified Registered Nurse Anesthetist (CRNA).  An

endotracheal tube was inserted nasally and Rex was hooked up to an intravenous (IV) line. The

surgery commenced at approximately 2:55 p.m. and was completed by approximately 3:30 p.m.

The surgery proceeded without incident and it appears from the record that Rex was somewhat

awake and breathing on his own after the surgery was completed.  At this time, Rex's oxygen

saturation was excellent, his skin color was pink, and his heart rate was approximately 150-160

beats per minute.

After surgery, Dr. Holbrook and Mr. Steele transported Rex to the Intensive Care Unit

(ICU).  The parties are in dispute as to the exact time of arrival in the ICU; regardless of this

dispute, however, it is uncontroverted that they arrived sometime between 3:50 p.m. and 4:00

p.m.  At some point either during transport or in the ICU, Rex's condition deteriorated

drastically.  Dr. Holbrook and Mr. Steele mutually agreed to remove Rex's endotracheal tube

either shortly before or shortly after Rex arrived in the ICU.  After the endotracheal tube was

removed, Rex went into cardiopulmonary arrest and cardiopulmonary resuscitation was initiated.

At some point, Rex experienced a period of hypoxemia during which time his brain cells were

deprived of oxygen, resulting in profound global cerebral hypoxia, leaving him in a persistent

2

vegetative state.

Since that date, Rex has remained in a persistent vegetative state.  He is currently being cared for in San Juan Manor, which is approximately an hour's drive from Ms. Chia's home.  Rex requires round-the-clock nursing care and will require such care for the remainder of his life.  He will never be able to obtain any form of gainful employment and will never be able to care for himself.

## II. FINDINGS OF FACT

1.      On May 10, 1999 Rex Freeland was fifteen years of age.

2.      As of May 10, 1999 Rex Freeland had been living with his mother, his brother Roderic Freeland and his sisters Roshanda Freeland, Rodricana Freeland, Roxanda Freeland, Yolanda Freeland, and Rolanda Freeland.

3.      Rex Freeland is a Native American, and a member of the Navajo Tribe.

4.      On May 10, 1999 Rex was taken to GIMC by his mother, Roselyn Chia.

5.      Dr. Jerome Holbrook, a dentist board certified in oral surgery, admitted Rex to GIMC with a diagnosis of right facial cellulitis involving the lateral pharyngeal, right submandibular, right submental, and left submental spaces; carious tooth number thirty-one and multiple carious teeth.

6.      Dr. Holbrook recommended that Rex undergo an incision and drainage procedure.

7.      At that time, Dr. Holbrook was a Commander in the Commissioned Corps, Indian Health Service, United States Public Health Service, which is a division of the Department of Health and Human Services of the Government of the United States.  Dr. Holbrook was assigned to the Navajo area of the Indian Health Service, and was stationed at the Gallup Indian Medical

3

Center.

8.     Dr. Holbrook undertook to perform oral surgery commencing at approximately 2:55 p.m. on May 10, 1999.

9.     On May 10, 1999, Michael Steele was a registered nurse, licensed in New Mexico, with specialty training as a CRNA.

10.     Prior to surgery, Rex was intubated nasally with an endotracheal tube placed through his nose into his pharynx and down into his bronchial tube.  It took three attempts before Rex was successfully intubated.  Rex was agitated and aggressive during the intubation. Anesthetizing 15-year-old boys is frequently difficult, as they are usually agitated and aggressive.

11.     Rex had an abscess, resulting in swelling around the airway.  Oral surgery frequently contributes to swelling around the airway.

12.     Dr. Holbrook and Nurse Steele knew, or should have known, that Rex was likely to have a swollen airway after surgery was completed and that Rex, like most adolescent boys, was likely to emerge from anesthesia agitated and aggressive.

13.     During the surgery, Rex received general anesthesia intravenously and through the endotracheal tube.

14.     Surgery was completed at approximately 3:30 p.m., at which time Rex was breathing spontaneously and maintaining oxygen saturation, with blood pressure of 160/90, a heart rate of approximately 150 beats per minute, respiratory rate of 20 breaths per minute, and oxygen saturation of 99%.

15.     From the end of surgery until after the extubation, Dr. Holbrook was the only physician, osteopathic physician, dentist or podiatrist present.

4

16.     The plan had been to transport Rex to the ICU after surgery, and to keep the endotracheal tube in place overnight, because of concern about Rex's airway.

17.     According to hospital records, Rex Freeland was transported from the operating room at 3:40 p.m., and was transported to the ICU by Dr. Holbrook and Mr. Steele.

18.     The ICU is approximately fifty yards from the operating room.

19.     No measurements or record of Rex's vital signs or of his oxygen saturation were made between the time he left the operating room and the time he arrived in the ICU.

20.     Rex Freeland's heart rate, respiratory rate, and oxygen saturation should have been continuously monitored at all times from the conclusion of surgery until he arrived in the ICU.

21.     As soon as Rex showed signs of hypoventilation, bradycardia, cyanosis, or decreasing oxygen saturation, appropriate intervention should have been instituted, including ventilatory assistance with an ambu bag, adjustment of the endotracheal tube, muscle paralysis, sedation, and the administration of cardiac stimulants.

22.     Rex's IV became dislodged sometime during transport between the operating room and the ICU.  Dr. Holbrook and Nurse Steele should have noticed this and intervened.

23.     Geraldine Winkler, R.N. was the nurse on duty in the ICU when Rex arrived.

24.     Nurse Winkler observed that upon arrival at the ICU, Rex's skin was cyanotic - a bluish color indicating that his blood was not being oxygenated.  Nurse Winkler also observed that Rex was making bodily movements consistent with early signs of brain damage.

25.     Rex arrived in the ICU sometime between 3:50 p.m. and 4:00 p.m.  The clock on the monitoring equipment in the ICU showed that Rex arrived at 3:57 p.m.  This is consistent with information contained in the Code Information Sheet.  The report prepared by Nurse Steele

showed that Rex arrived at 3:50 p.m.

26.     It took at least ten minutes for Dr. Holbrook and Nurse Steele to transport Rex

from the operating room to the ICU.  At some point during this transport, Rex either stopped

breathing, or his breathing slowed to a dangerously low rate (i.e., he was "hypoventilating").

Rex's brain was deprived of oxygen for some period of the transport.

27.     Approximately one to three minutes after Rex arrived in the ICU, Nurse Winkler

measured his vital signs.  By this time, Rex's oxygen saturation had dropped to 65%, his heart

rate had dropped to 35 beats per minute (i.e., Rex was "bradycardic"), and he was not breathing

(i.e., Rex was "apneic").

28.     Nurse Steele noted on his report that Rex was both apneic and bradycardic upon

arrival at the ICU.

29.     Within a few minutes of arrival in the ICU, Dr. Holbrook and Nurse Steele made a

joint decision to remove Rex's endotracheal tube.

30.     The endotracheal tube was the means by which air was being delivered to Rex's

lungs.  The endotracheal tube should not have been removed.

31.     Immediately after the endotracheal tube was removed, Rex went into

cardiorespiratory arrest.  A "code blue" was called.  Cardiopulmonary resuscitation was initiated.

32.     Within a few minutes, the endotracheal tube was replaced and oxygen was being

pumped into Rex's lungs.  In addition, the dislodged IV was replaced and Rex received atropine

and epinephrine.  His heart then began to beat effectively.

33.     An arterial blood gas (ABG) sample was taken within a few minutes after Rex was

reintubated.  The ABG showed that Rex's oxygen saturation was 98% and his PCO2 was 112.

6

This indicates that Rex was experiencing severe respiratory acidosis.

34.  A person with a sustained PCO2 of 112 cannot live.  Rex's PCO2 indicates that he had not been breathing (or had been hypoventilating) for at least seven to twenty minutes prior to the time the ABG was drawn.

35.  Rex suffocated sometime between 3:30 p.m. and 4:00 p.m., while he was under the care and supervision of Dr. Holbrook.

36.  As the percentage of oxygen in his blood decreased during this time, as a result of either apnea or hypoventilation, Rex's heart rate also gradually decreased, causing increasingly less oxygenated blood to reach his brain.

37.  Ultimately, Rex's brain was receiving no oxygenated blood, or an insufficient amount of oxygenated blood, and the cellular environment became increasingly acidotic, until ventilation and circulation were restored after reintubation.

38.  During the entirety of the time from initiation of surgery through reintubation, Rex was entirely under the influence of anesthetic medications, making him completely and absolutely dependent on Dr. Holbrook and Nurse Steele for his health and safety.

39.  Dr. Holbrook admitted Rex to the hospital and was Rex's treating physician while Rex was in the hospital.  Dr. Holbrook was the physician who performed the surgery and developed the post-operative plan.

40.  As a direct and proximate result of the negligence of Dr. Jerome Holbrook and Nurse Steele, Rex Freeland was suffocated, causing hypoxic ischemic encephalopathy.

41.  Rex had no brain damage prior to the surgery.

42.  Rex has not awakened.  Rex will never wake up.  Rex will require licensed nursing

care twenty-four hours per day for the rest of his life.

43.     Rex will never be able to obtain any form of gainful employment.

44.     Rex will never be able to care for himself.

45.     Rex will receive superior care if he is cared for by skilled nurses in the home, rather than in a nursing institution.  Rex will receive the love and attention of his family members on a daily basis if he is cared for in the home.

46.     Rex will need physical and occupational therapy on a regular basis, not just annually.

47.     Rex will not benefit from speech or cognitive therapy.

48.     The family will require more than twelve counseling sessions.

49.     Rex's medical needs go beyond that which can be obtained in Farmington, New Mexico.

50.     The cost of obtaining appropriate care for Rex in Albuquerque, New Mexico is at least $253,042 per year.  The cost of obtaining appropriate care for Rex in Phoenix, Arizona is between $306,270 and $376,350 per year.

51.     As a result of his injuries, Rex's life expectancy has been shortened.  If Rex receives appropriate medical, nursing, and related care at home, he should have a life expectancy of approximately forty years.[1]

---

[1]     Defendant contends that Rex's life expectancy is eight and one half years, whereas Plaintiffs argue that Rex's life expectancy has not been reduced at all.  As all of the experts who testified on this issue acknowledged, it is not possible for the Court to make a precise determination as to the number of years that Rex is likely to live.  The Court does find, however, that if the family is compensated on the basis that Rex will live another 8.5 years, the family will likely have to put Rex in a nursing home at the expiration of 8.5 years because they will have exhausted their damage award.  As explained in detail elsewhere in the Court's Findings of Fact

52.     Over Rex's life, the cost of his medical care, reduced to present value, will total at least $7,653,284 if the family lives in Albuquerque.  Over Rex's life, the cost of his medical care, reduced to present value, will total between $9,150,735 and $11,295,316 if the family lives in Phoenix.

53.     Plaintiffs would prefer to live in Phoenix because there are family members, including some of Rex's siblings, who live there.

54.     The cost of purchasing a home in which Rex can be cared for at home is approximately $180,000.00.

55.     The cost of modifying a home to accomodate Rex's medical care needs is approximately $35,000.00 to $60,000.00.

56.     The value of Rex's earning capacity which has been lost as a result of his injury is $929,970.00.

57.     The value of the household services which have been lost as a result of Rex's injury is $222,313.00.

58.     Rex experienced conscious pain and suffering while he was being suffocated.  The value of this pain and suffering is $250,000.00.

59.     There was substantial evidence presented at trial that Rex Freeland is a member of a close and loving family.  Ms. Chia testified at trial that Rex was very close with his siblings and that he enjoyed spending time with both of his parents before his accident.  Mr. Freeland testified that Rex and he used to do jobs around the house and ride horses together.  Mr. Freeland also

---

and Conclusions of Law, the Court finds that Plaintiffs are entitled to have Rex live in their home with them, where he can receive the level of care that he requries.

testified that Rex had several close friends that he often spent time with.  Ms. Chia testified at length about Rex's sense of humor and his tendency to bring happiness to those around him.  At trial, the Court had the opportunity to review several photographs of Rex with his friends and family.  Both of Rex's parents testified that Rex very much enjoyed riding and taking care of his horse.

        The Court also had the opportunity at trial to review a videotape of Rex in his current setting.  The video contains images of Rex lying in his bed and of his family members tending to him.  The Court saw Rex's family members talking to Rex, applying lotion to his arms and legs, helping him stretch his muscles, and attempting to make him comfortable.  Frequently, when someone would move one of Rex's limbs, it would appear that Rex was grimacing in pain.  The Court had the opportunity to view, several times, a close-up of Rex's face in his position.  Plaintiffs' expert neurologist, Dr. Breeden, testified that Rex does not respond to pain stimuli in the way that healthy individuals do, because of the extent of damage done to his neurological system.  However, Dr. Breeden could not say for certain whether or not Rex experiences any recognition of his mother's voice, of his sisters' touch.

        Based on the testimony presented at trial, on the photographs of Rex with his friends and family, and on the videotape of Rex being cared for by his family, the Court finds that Rex Freeland was once a healthy adolescent boy with a large community of friends and family, with many interests and activities, who enjoyed life.  The Court further finds that Rex made an important contribution to his family.  Based on all of this evidence and on the Court's own observations at trial, the Court finds that Rex has lost the value of his enjoyment of life as a result of this tragic accident.

60.     Both Roselyn Chia and Roger Freeland lived with and cared for Rex for a significant period of time prior to Rex's accident.  Ms. Chia and Mr. Freeland have suffered emotional injury as a result of the loss of Rex's companionship.

61.     The cost of providing medical and medical related care to Rex from the time of injury to the time of trial is approximately $387,249.94.

### III.  CONCLUSIONS OF LAW

1.     The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 2671 *et seq.* and 28 U.S.C. § 1346(b).

2.     Plaintiffs have complied with the administrative requirements of the Federal Tort Claims Act.

3.     New Mexico substantive tort law applies to the facts of this case.

4.     Jerome Holbrook is a dentist employed by the United States of America.  Michael Steele is a certified registered nurse anesthetist employed by the United States of America.

5.     On May 10, 1999, Dr. Holbrook and Nurse Steele both undertook to provide care to Rex.  At all times material Dr. Holbrook had primary responsibility for the care and treatment provided to Rex, and was ultimately responsible for Rex's well-being.

6.     Under New Mexico law, Dr. Holbrook and Nurse Steele had a duty to possess and apply the knowledge and to use the skill and ordinary care ordinarily used by reasonably well-qualified health care providers practicing under similar circumstances, giving due consideration to the locality involved.  *See Alberts v. Schultz,* 975 P.2d 1279, 1284 (N.M. 1999).

7.     Dr. Holbrook and Nurse Steele were negligent if they breached this duty of skill

and care.  *See id.*[2]

     8.     Dr. Holbrook and Nurse Steele were negligent in that:

     a.     the failure to restrain and/or sedate Rex, knowing that Rex was likely to have a swollen airway and knowing that Rex was likely to be agitated and aggressive upon emerging from anesthesia fell beneath the applicable standard of care;

     b.     the failure to monitor Rex during transport from the operating room to the intensive care unit fell beneath the applicable standard of care;

     c.     the failure to intervene once Rex began to have trouble breathing fell beneath the applicable standard of care;

     d.     the failure to intervene once Rex's IV became dislodged fell beneath the applicable standard of care;

     e.     the failure to notice that Rex had stopped breathing and that Rex's brain was likely being deprived of oxygen fell beneath the applicable standard of care; and

     f.     the decision to extubate was reckless and fell beneath the applicable standard of care.

     9.     Plaintiffs must prove that Rex's injury was caused by Dr. Holbrook's and Nurse Steele's negligence.  *Alberts,* 975 P.2d at 1286.

     10.     A proximate cause of an injury is that which in a natural and continuous sequence unbroken by an independent intervening cause produces the injury, and without which the injury

---

[2]     *See also Cervantes v. Forbis*, 389 P.2d 210, 213 (N.M. 1964) ("Before a physician or surgeon can be held liable for malpractice in the treatment of his patient, he must have departed from the recognized standards of medical practice in the community, or must have neglected to do something required by those standards.").

would not have occurred.  Plaintiffs must show by a preponderance of the evidence that the

defendant's negligence resulted in the injury.  The plaintiff is not required to prove causation to an

absolute certainty; rather, the probability of the causal link between negligence and injury must be

supported by the weight of the evidence.  The standard for establishing causation in New Mexico

is proof to a reasonable degree of medical probability. *See Madrid v. Lincoln County Med. Ctr.*,

923 P.2d 1154 (N.M. 1996).

11.     Plaintiffs have proven, to a reasonable degree of medical certainty, that the

negligence of Dr. Holbrook and Nurse Steele proximately caused Rex's injury.

12.     As Rex's parents, Roger Freeland and Roselyn Chia are responsible for Rex's

medical care expenses.

13.     Awarding damages for lost earnings and for future medical expenses does not

result in a double recovery.  Lost earnings and future medical expenses are both recoverable in a

medical malpractice action.

14.     It is appropriate to include employer-paid fringe benefits, including health

insurance, in calculating the value of lost earnings.  Doing so does not result in a double recovery.

15.     Plaintiffs are entitled to recover the value of the household services that were lost

as a result of Rex's injury.  Based on the testimony presented at trial, it is appropriate to calculate

the value of lost household services by determining the household services of the average male

(15.1 hours per week), valued at market replacement cost.

16.     In New Mexico, "damages are recoverable for the value of the loss of enjoyment

of life itself whether or not the injured party is deceased."  *Sena v. New Mexico State Police*, 892

P. 2d 604, 610 (N.M. Ct. App. 1995).  Moreover, "where an expert witness has been properly

qualified, it is not improper for the trial court to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life." *Id.* at 611. Therefore, it was proper for Dr. McDonald to testify regarding his opinion concerning the economic value of Rex's loss of enjoyment of life. Plaintiffs are entitled to recover for the value of what Rex "would have reaped from life as demonstrated by his [] health or habits." *Romero v. Buyers*, 872 P.2d 840, 846 (N.M. 1994). Based on the Court's prior findings of fact, the Court finds that the value of the loss of Rex's enjoyment of life is $1,000,000.00.

17.     In cases such as this, where a child has been killed or injured, damages for loss of consortium are available if the plaintiff is a "familial care-taker, such as a parent or grandparent, who lived with and cared for the child for a significant period of time prior to the injury or death," and the plaintiff "suffered emotional injury as a result of the loss of the child's companionship, society, comfort, aid, and protection." *Fernandez v. Walgreen Hastings Co.*, 968 P.2d 774, 784 (N.M. 1998). The Court finds that Roselyn Chia and Roger Freeland are both entitled to damages for loss of consortium and that value of such loss, for each of them, is $500,000.00.

18.     Under New Mexico law, a doctor is liable for the negligence of an assistant, nurse, doctor, technician, or other person, if the doctor has the right to control the manner in which the details of a particular activity giving rise to the injury are performd and the particular activity giving rise to the activity is being performed under the immediate and direct supervision of the doctor. UJI 13-1114, NMRA 1998.

19.     Under New Mexico law, Nurse Steele, a CRNA, is permitted to practice only under the direction of and in collaboration with a licensed physician, osteopathic physician, dentist

or podiatrist licensed in New Mexico.  *See* N.M. Stat. Ann. § 61-3-23.3C (NMRA 1978).[3]

20.     As the treating physician who admitted Rex to the hospital, who performed the surgery, and who transported Rex to the intensive care unit, Dr. Holbrook is primarily responsible for any and all injuries and damages which occured.  Dr. Holbrook had the right to control the manner in which the anesthesia and surgery were performed.  The anesthesia and surgery were performed under the direct supervision of Dr. Holbrook.  Therefore, Dr. Holbrook is responsible for the negligence of Nurse Steele.

21.     The New Mexico Medical Malpractice Act imposes a $600,000 limit on damages in medical malpractice actions.  *See* N.M. Stat. Ann. § 41-5-6 (NMRA 1978).  However, as this court has already found, the $600,000 limitation on damages does not apply in this case, to the extent that Dr. Holbrook's negligence caused Rex Freeland's injuries because Dr. Holbrook is not a "health care provider" under the terms of the statute.  *See* N.M. Stat. Ann. § 41-5-3(A) (NMRA 1978).  Because Dr. Holbrook is responsible for the negligence of Mr. Steele, the damages cap does not apply in this case.

22.     Under federal law, the state of New Mexico is entitled to recover from the plaintiffs any expenses for Rex's medical care that have already been paid by Medicaid.  That money will then be turned over to the United States Treasury.  Therefore, it is not appropriate to set off the damage award by the amount already paid by Medicaid.  Plaintiffs' counsel will assist the plaintiffs in reimbursing the state for expenses due.

23.     It is not appropriate for the plaintiffs' damage award for future medical expenses

---

[3]     This provision has been repealed, effective July 1, 2004.  The provision was in effect at the time of the events in question.

15

to be placed in a reversionary trust.[4]

24.     New Mexico law provides, by statute, that "[w]henever the death of a person shall be caused by the wrongful act, neglect or default of another . . . the person who, or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured."  N.M.  Stat.  Ann. § 41-2-1 (NMRA 1978).  Plaintiffs have not provided, and the Court has not found, any authority supporting the proposition that damages should be awarded under the wrongful death statute in a medical malpractice action where the tort victim suffers a shortened life expectancy.  Therefore, the Court declines to award damages under the wrongful death statute in this case.

25.     Pursuant to the Local Rules of this Court, plaintiffs are to submit a cost bill within 30 days of the date of entry of this Judgment.  Plaintiffs are also entitled to post-judgment interest.

## III.  RELIEF

Plaintiffs are entitled to judgment against the Defendant United States for damages which resulted from the negligence of the Defendant's employees, as follows:

_____

[4]        In *Hill v. United States*, 81 F.3d 118 (10th Cir. 1996), also an FTCA case, the Tenth Circuit ruled that it was appropriate to place damages for future medical expenses in a reversionary trust.  It specifically based its holding on a provision of the Colorado Health Care Availability Act, pursuant to which payments for future medical expenses cease upon the death of the tort victim.  There is no analogous provision in the New Mexico Medical Malpractice Act.  Therefore, the Court finds that *Hill* is inapposite.  The Court also finds that *Hull v. United States*, 971 F.2d 1499 (10th Cir. 1992), does not support a reversionary trust in this case.  In *Hull*, the Tenth Circuit ruled that the district court had inherent authority to place a damage award in a reversionary trust, but could only do so upon finding that it was in the tort victim's best interest. *See id.* at 1505.  In determining whether or not to place the damage award in a reversionary trust, a district court is not to consider the possibility that the tort victim's family might receive a "windfall" upon the untimely death of the victim.  The Court does not find that it is in Rex's best interest to have the damage award for future medical expenses placed in a reversionary trust.

a.      Past medical care: $387,249.94

b.      Future medical care: $11,295,316.00

c.      Cost of purchasing a home: $240,000.00

d.      Lost earning capacity: $929,970.00

e.      Lost household services: $222,313.00

f.      Conscious pain and suffering: $250,000.00

g.      Loss of enjoyment of life: $1,000,000.00

h.      Loss of consortium of Roselyn Chia: $500,000.00

i.      Loss of consortium of Roger Freeland: $500,000.00

The Court acknowledges that this is a high damage award.  Nonetheless, the Court finds that it is warranted.  This case can be described as nothing other than a tragedy.  Ms. Chia left her son in the care of an oral surgeon thinking that he was going to have an abscess drained.  Ms. Chia testified that the last thing she told Rex before he went into surgery was not to be afraid because everything was going to be okay.  Now, every day is a reminder to Ms. Chia, Mr. Freeland, and all of Rex's siblings, of the kind of person that their son and brother was, and the state that he is in now.

It is common knowledge that the cost of on-going quality health care is exorbitant.  Providing 24-hour skilled nursing home care is an expensive undertaking.  At trial, it was revealed that Ms. Chia is an accountant for the Navajo Tribe and that Mr. Freeland is a bus driver.  This family simply cannot afford to pay for Rex to have 24-hour care in the home.  Nonetheless, the Court finds that they are entitled to it.

Accordingly, Plaintiffs are hereby awarded $15,324,848.94 in compensatory damages

17

against the United States, plus post-judgment interest and Plaintiffs' reasonable costs in amounts

to be later determined.

Dated this 21st day of August, 2001.


_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE


<u>Attorneys for Plaintiff</u>
Stephen Moffat
Guy Dicharry

<u>Attorney for Defendant</u>
Phyllis Dow

18